**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

_____

UNITED STATES OF AMERICA,

      Plaintiff,

    vs.                         No. 1:23-cr-00953-KWR-2

NORA BACA,

      Defendant.

## MEMORANDUM OPINION AND ORDER ON UNITED STATES' AND DEFENDANT'S OBJECTIONS TO EXPERT TESTIMONY

THIS MATTER comes before the Court on the parties' objections to expert testimony noticed under Federal Rule of Evidence ("Rule") 16. Defendant Nora Baca objects to the Government's expert witness FBI SA Jordan Spaeth (**Doc. 171**). Meanwhile, the Government objects to Defendant's drug addiction expert Dr. Gantt Galloway (**Doc. 176**). The Court held a hearing on January 23, 2026, where the proposed experts testified.

After reviewing the notices, the briefing, and the experts' testimony, the Court will admit the opinions of Dr. Galloway and SA Spaeth. The objections are **OVERRULED**.

## BACKGROUND

Defendant is charged with possession with intent to distribute 500 grams and more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) and 18 U.S.C. § 2 (Count One), possession with intent to distribute 5 grams and more of methamphetamine, in violation of § 841(a)(1), (b)(1)(B)(viii) (Count Two), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) and *Pinkerton v. United States*, 328 U.S. 640 (1946) (Count Three). **Doc. 150 at 1–2** (Second Superseding Indictment).

The charges follow a search of Defendant's residence in May 2023. *Id.* During the search, Federal Bureau of Investigation ("FBI") agents found Defendant and her codefendant at the residence. **Doc. 105 at 3**. Her codefendant was found in the same room as the firearms and the majority of the methamphetamine, and Defendant was found in a different room with a smaller amount of methamphetamine. *Id.* Defendant was later arrested and charged for the methamphetamine and firearms found and seized during the May 2023 search. *Id.***; Doc. 150**.

Pursuant to Rule 16, the Government and Defendant filed notices of their intent to offer expert testimony. **Doc. 89; Doc. 177**. Both parties objected to the notices, and their proposed experts testified at a *Daubert* hearing. **Doc. 217**. The Court took this matter under advisement.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, a district court "must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact before, permitting a jury to assess such testimony." *United States v. Vann*, 776 F.3d 746, 757 (10th Cir. 2015) (citing *United States v. Rodriguez-Felix,* 450 F.3d 1117, 1122 (10th Cir. 2006)). First, a court must determine

whether the expert is qualified by "knowledge, skill, experience, training or education" to render an opinion. *See* Fed. R. Evid. 702. Second, if the witness is qualified, a court must determine whether the expert's opinions are "reliable." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (scientific knowledge); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, (1999) (technical and other specialized knowledge). Finally, a court must determine whether the proposed expert testimony would be relevant.

To help assess reliability, the Supreme Court in *Daubert* listed five nonexclusive factors that a court may consider: (1) whether the theory or technique in question can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community. 509 U.S. at 593–94. When assessing the reliability of a proposed expert's testimony, a court may consider the *Daubert* factors to the extent relevant, which will depend on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Kumho Tire*, 526 U.S. at 150–51. "[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 139.

When an expert's testimony is based on experience, a court does not need to apply the *Daubert* factors to determine the testimony's reliability. *United States v. Nichols*, 169 F.3d 1255, 1265 (10th Cir. 1999). Rather, a witness "relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702

advisory committee's note (2000 Amendment), *quoted in United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014).

Nevertheless, regardless of *Daubert* applicability, a court must perform its duty as a gatekeeper and make a reliability determination. *See United States v. Avita-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012).

## DISCUSSION

For the reasons discussed below, the Court finds that Dr. Gantt Galloway and FBI special agent ("SA") Jordan Spaeth may testify as Rule 702 experts.

## I.    **Dr. Gantt Galloway.**

Defendant filed notice that she intends to offer Dr. Gantt Galloway as a clinical addiction expert at trial. **Doc. 177** (Amended Notice). The United States objected to Defendant's notice and motioned for a *Daubert* hearing, which was held on January 23, 2026. *See* **Doc. 176 at 5; Doc. 178**. At the hearing, Dr. Galloway's opinions were clarified to: (1) Defendant has a severe methamphetamine addiction, (2) some severely dependent users of methamphetamine consume extremely large amounts of methamphetamine, up to multiple grams per days, (3) users acquire methamphetamine in different quantities and may obtain more than one dose at a time, and (4) 30 or 33 grams of methamphetamine could be consistent with personal use for someone in a severe addicted state. During closing, the Government withdrew its objections to Dr. Galloway's second and third opinions.

Dr. Galloway has a Ph.D. in pharmacy from the University of California, San Francisco. Professionally, he has been involved in clinical practice and research related to drug addiction since 1988. During his career, he has encountered thousands of methamphetamine addicts in his clinical and research work, which involved assessments of these addicts. He is familiar with the

pharmacological properties of methamphetamine and with patterns of methamphetamine use and addiction. And much of his research has been with methamphetamine. Accordingly, the Court finds that Dr. Galloway is qualified by knowledge, training, education, and experience to offer opinions about methamphetamine addiction and use.

As to Dr. Galloway's first opinion, that Defendant has a severe methamphetamine addiction, the Court finds that this opinion is based upon the application of reliable principles and methods. Dr. Galloway formed his opinion by applying the established instrument, the Mini International Neuropsychiatric Interview, which uses the criteria within the fifth edition of the Diagnostic and Statistical Manual of Mental Illnesses (DSM-5), as well as his clinical assessment knowledge and experience. Dr. Galloway conducted two evaluations of Defendant, a brief interview and a substantial 3.5-hour evaluation, during which he had the opportunity to observe Defendant and to apply his clinical expertise and decades of experience with methamphetamine addicts. He relied on information self-reported by Defendant—an accepted practice used in the field of study—to input the data into the instrument to reach his opinion. He also reviewed some of Defendant's medical records and spoke with two of her relatives to corroborate his opinion.

Regarding the Government's objection to Dr. Galloway's first opinion, the Court overrules the objection since Dr. Galloway's opinion is based on reliable methods. *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014) ("Accordingly, a district court must admit expert testimony as long as it is based on a reliable methodology."). It is up to the jury to evaluate the reliability of Dr. Galloway's underlying data through the self-reporting by Defendant and the information from her relatives. *See United States v. Foust*, 989 F.3d 842, 847 (10th Cir. 2021). The Government may cross examine Dr. Galloway to elicit issues with self-reported data and potential bias, subject to Rule 403 balancing. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

As to Dr. Galloway's second opinion, that severely dependent users of methamphetamine consume extremely large amounts of methamphetamine, up to multiple grams per days, the Court finds that this opinion is reliably based on his knowledge and clinical training and experience. Dr. Galloway has interviewed hundreds of methamphetamine addicted users about how much of the drug they use and how often. The great majority of them would report their use in grams, not in generalities. He also relied on a couple of case reports and conversations with colleagues. Further, he has applied the DSM-5 to methamphetamine-addicted users to assess how they build a drug tolerance over time.

In the same extensive clinical interview experiences, Dr. Galloway gathered detailed information from methamphetamine users about their patterns of use and acquisition. He would observe usage patterns through long-term observation. He encountered methamphetamine users who would acquire multiple doses at a time, depending on their binge habits and available funds. And he obtained further information from discussions with colleagues, seminars, and conferences. Accordingly, the Court finds that Dr. Galloway's third opinion, that users acquire methamphetamine in different quantities and may obtain more than one dose at a time, is based on reliable methods.

As to Dr. Galloway's fourth opinion, that 30 or 33 grams of methamphetamine could be consistent with personal use for someone in a severely addicted state, the Court finds that this opinion is reliably based on his training and education, clinical experience, training, and existing case reports. The Court agrees with Defendant that Dr. Galloway's fourth opinion does not equate "personal use" with a single or daily dose. Rather, Dr. Galloway testified that using 30 grams of

methamphetamine in a day would put a user at risk for severe consequences. And direct and cross-examination will elicit the details of what may be a commonly or uncommonly reported dose amount and what the case reports contain. A jury can determine how much weight to assign to the amounts reported in the case studies. Accordingly, the Court overrules the Government's objection as to Dr. Galloway's fourth opinion.[1]

For the reasons above, the Court finds that Dr. Galloway's opinions are based on reliable methods. Further, Dr. Galloway's opinions are relevant to the defend the charges against Defendant.

## II.    FBI SA Jordan Spaeth.

Next, the Government filed notice that it intends for SA Spaeth to testify on several categories of information related to drug trafficking and firearms, such as the practice of relying on places and people to store drugs, the use of common types of code words, and the relationship between drug trafficking and firearms. **Doc. 89**. SA Spaeth's testimony would rely on his experience and training. *Id.* In response, Defendant objected to SA Spaeth as an expert witness because the notice failed to explain how his experience would lead to the conclusion reached, why his experience would be a sufficient basis for the opinion, and how his experience would be reliably applied to the facts. *See* **Doc. 171**; **Doc. 179**; Fed. R. Evid. 702 advisory committee's note (2000 Amendment). Defendant further objected to specific opinions, which the Court will address in turn below.

---

[1] Further, the Court finds that Dr. Galloway's opinions do not impermissibly comment on Defendant's intent since they were rephrased at the *Daubert* hearing to omit reference to Defendant. *See* **Doc. 205 at 3**.

Although a hearing was not necessarily required under Rule 702 and *Daubert*, *see Nichols*, 169 F.3d at 1263, the Court chose to hold a hearing to hear evidence on SA Spaeth's experience and training to determine whether his expert testimony would be reliable.

As an initial point, the Court notes that the Tenth Circuit has long history of permitting law enforcement to testify as experts based on their experience and expertise.  *See United States v. Martinez*, 88 F.4th 1310, 1314 (10th Cir. 2023) (listing cases); *see also United States v. Kamahele*, 748 F.3d 984, 998 n.8 (10th Cir. 2014).  Generally, expert law enforcement testimony is helpful to the jury "because the average juror is often innocent of the ways of the criminal underworld, and it provides jurors a context for the actions of defendants."  *Id.* (quoting *United States v. Garcia*, 635 F.3d 472, 477 (10th Cir. 2011).

SA Spaeth has worked in law enforcement for 28 years, first as a patrolman in Virginia before joining the FBI, where in 2018 he began working as an agent in Albuquerque. In the Violent Crime Taskforce, he would assist with narcotics cases as a junior agent.  And for the last six years, he has been assigned to the Violent Gang Taskforce ("VGT"), where he has been the lead agent on several dozen cases, including the Brew Town Locos investigation.  At the VGT, he investigates criminal enterprises, which often involve drug trafficking and firearm violations.  He has arrested several dozen defendants in drug trafficking cases.  He has worked with undercover agents a dozen times, worked with hundreds of confidential sources involved in the drug trade, and interviewed hundreds of drug traffickers. SA Spaeth has been involved with more than 50 search warrant executions.  He has received firearm training throughout his career, including formal training as part of his SWAT team training and the International Firearm Specialist Academy.  Accordingly, the Court finds that SA Spaeth is qualified as a law enforcement expert.

As to SA Spaeth's first opinion, that "sophisticated drug traffickers often prefer to isolate themselves from their product and any firearms, by relying on others to store it and thereby reducing their own exposure to violence or arrest," **Doc. 89**, the Court finds that SA Spaeth's opinion is reliably based on his experience and training. SA Spaeth's testimony on this method and practice is not based on scientific methodology, nor does it need to be. *See United States v. Kamahele*, 748 F.3d 984, 999 (10th Cir. 2014). Instead, SA Spaeth's opinion is based on his cumulative knowledge gained from years of experience (including other cases described during the hearing) and speaking with other drug traffickers, cooperating defendants, and confidential human sources. Specifically, it was formed by applying his knowledge and experience—which considers the context of items found in rooms, communications found, confidential human sources, cooperating defendants, independently corroborated evidence, drug packaging, the location of tools, and lack of paraphernalia—to facts of Defendant's case. Although SA Spaeth is familiar with the May 2023 search and facts of the case, the Court does not find that he is simply vouching for the Government's fact witnesses.

As to SA Spaeth's second opinion, describing the tools of the trade, the Court finds that he may reliably testify as to mobile phones, packing materials, digital scales, and, as discussed further below, firearms. As to mobile phones, the Court recognizes that the average juror today would likely not need the assistance of an expert to understand that mobile phones are a tool of the trade. Yet, this testimony will set the foundation for SA Spaeth's testimony as to the use of code words in text messages, which will be helpful to an average juror. Accordingly, the Court will allow it.

As to SA Spaeth's third opinion regarding drug traffickers' use of "code words," the Court finds that it is reliably based on his knowledge and experience gathered from cooperators, jail calls, cell phone searches, and interviews with defendants and suspects. His experience is a sufficient

basis for testifying as to use of code words in this case, particularly since the types of code words are not uncommon. *See United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (court erred by not requiring government to explain method of interpreting new code words for cocaine and instead relying on general qualifications). And this is not a case involving circular reasoning where SA Spaeth developed his experience by investigating the exact case at hand and is later presented as an expert at trial to testify about the meaning of those code words. *See United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1249–50 (D.N.M. 2015). SA Spaeth will be helpful to an average juror to determine the potential use and meaning of code words in this case. The jury can determine how much weight to afford his expertise.

As to SA Spaeth's fourth opinion, SA Spaeth is a qualified expert; he does not need to be a clinician or addiction expert to opine on personal use amounts—his 28 years of cumulative experience, including his patrol officer work and his role as a lead agent within the Violent Gang Task Force, is sufficient. Through interviews over the course of his career, he has heard common usage amounts and why users have a difficult time retaining a large supply of drugs consisting of many uses.

Turning to the reliability assessment, the Court finds that SA Spaeth's fourth opinion is reliably based on his experience executing search warrants; interviewing defendants, cooperators, confidential human sources and agents; and searching cellphones. His experience forms a sufficient basis for his opinion regarding weights that methamphetamine is commonly sold and the dollar value of those weights. Further, the Court will allow SA Spaeth to testify "that the amounts of methamphetamine and fentanyl pills seized in this case are not personal use amounts, and that they would be worth thousands of dollars." Although the Court recognizes that the jury may infer and conclude whether the amount in Count One exceeds a personal dose on their own,

and the dollar value of the drugs, the Court does not find justification under Tenth Circuit precedent to limit SA Spaeth's testimony as to the drugs at issue in either Count. *See, e.g.*, *United States v. Muldrow*, 19 F.3d 1332, 1338 (10th Cir. 1994) (expert testimony that 4.4 kilograms of cocaine would be for distribution and not for personal use); *United States v. McDonald*, 933 F.2d 1519 (10th Cir. 1991) (expert testimony that 6.7 grams of cocaine was a lot larger than a dose). Accordingly, the Court declines to limit his testimony according to *United States v. Diaz*, No. 24-CR-0032 MV, 2024 WL 758395, at *9 (D.N.M. Feb. 23, 2024), as requested by Defendant.

As to SA Spaeth's remaining opinions related to firearms and the nexus of firearms and drug trafficking, the Court finds that those opinions are reliably based on his training and experience conducting many interviews and investigations, including the execution of search warrants in drug trafficking cases. SA Spaeth's opinions would be helpful to the jury because they extend beyond a general understanding that drug traffickers tend to protect themselves with firearms, such as his opinion as to what types of firearms drug traffickers tend to prefer and why. Further, the Court finds that SA Spaeth reliably applied his knowledge and training in the examination of the firearms at issue in this case.

For the reasons above, the Court finds that SA Spaeth sufficiently explained how his experience leads to the conclusion reached, why his experience is a sufficient basis for his opinions, and how his experience is reliably applied to the facts of the case. SA Spaeth's opinions are reliable, relevant, and helpful to the jury so that they may fully understand the evidence presented at trial. Further, SA Spaeth's opinions do not impermissibly express an opinion about Defendant's intent. *See Diaz v. United States*, 602 U.S. 526, 534 (2024).

## CONCLUSION

**IT IS THEREFORE ORDERED** that Dr. Gantt Galloway's expert testimony is admitted consistent with this Order.  The Government's objection (**Doc. 176**) is **OVERRULED**.

**IT IS FURTHER ORDERED** that FBI SA Jordan Spaeth's expert testimony is admitted consistent with this Order.  Defendant Nora Baca's objection (**Doc. 171**) is **OVERRULED**.

_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE